IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DESTINY FROST, | CASE NO. 1:25-cv-1407 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Destiny Frost filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying her application for supplemental security income and disability insurance benefits. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural Background**

In April 2017, Frost filed applications for supplemental security income and disability insurance benefits alleging a disability onset date of May 24, 2015.[1] Tr. 106, 120, 328, 330. The Commissioner denied Frost's applications, Tr. 166, 169, and she did not appeal those denials. In May 2019, Frost

---

[1]  "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

submitted another set of applications, which were also denied. *See* Tr. 141 (describing Frost application history). In December 2020, Frost filed a third set of applications. *Id*; *see also* Tr. 136, 137. Frost alleged that she was disabled and limited in her ability to work, based on the following conditions: generalized anxiety disorder, learning disability, major depression, bi-polar disorder/mood disorder, attention deficit disorder, polycystic ovarian syndrome, obesity, and vision/near-signed. *See* Tr. 413. The Commissioner denied this third set of applications both initially and on reconsideration. Tr. 178.

In February 2021, Frost requested a hearing on her applications. Tr. 184. In September 2022, ALJ Peter Beekman held a telephonic hearing on Frost's applications. Tr. 82. Frost appeared, testified, and was represented by counsel at the hearing. *Id*. In November 2022, ALJ Beekman issued a written decision, finding that Frost was not entitled to benefits. Tr. 141. In his decision, ALJ Beekman noted the multiple applications that Frost previously filed, which were denied and which Frost failed to appeal. *Id*. He detailed that Frost withdrew her later applications and ALJ Beekman reopened and proceeded to evaluate Frosts' original April 2017 applications. *Id*.

In December 2022, Frost appealed ALJ Beekman's decision to the Appeals Council. Tr. 246. In November 2023, the Appeals Counsel issued an order remanding Frost's application for further consideration of Frost's mental residual functional capacity and completion of the record. Tr. 161–63.

2

In May 2024, ALJ Chatherine Ma held a hearing. Tr. 48. Frost appeared, testified and was represented by counsel at the hearing. Tr. 48. Qualified vocational expert Eric Dennison also testified. Tr. 48. In June 2024, ALJ Ma issued a written decision, which found that Frost was not entitled to benefits. Tr. 48.

In July 2024, Frost appealed ALJ Ma's decision to the Appeals Council. Tr. 326. In May 2025, the Appeals Council denied Frost's appeal, Tr. 1–3, making ALJ Ma's May 2025 decision the final decision of the Commissioner, Tr. 17–39, *see* 20 C.F.R. § 404.981.

**Medical Evidence**[2]

The ALJ summarized the undisputed medical evidence follows:

> On August 15, 2017, the claimant attended a psychological consultative examination conducted by Natalie Whitlow, PhD, with a chief complaint of mood disorder, generalized anxiety disorder, attention deficit hyperactivity disorder, and learning disability. The claimant's medications included Zoloft, Adderall, and Latuda. The claimant stated that her medications helped. On examination, the claimant wore appropriate attire that appeared clean and well kept. She appeared to have attended to her personal hygiene. She maintained appropriate eye contact. She was friendly and pleasant and cooperative with the clinical interview format. She appeared to be alert and attentive and

---

[2]     The summary of medical evidence excerpted here is generally limited to the evidence that is cited in the parties' brief and that is relevant to Frost's claims. Additionally, to avoid repetition and in the interest of brevity, the ALJ's analysis of medical opinion evidence is included in conjunction with the evaluation of Frost's arguments.

3

was coherent with her communication. Overall, the claimant's speech and thought processing were within the normative range of functioning. However, Dr. Whitlow noted that the claimant had "moments" when she would engage in tangential talk, forget the questions that were posed to her, forget the information that she was supposed to be conveying, and have to ask for redirection in order to get back on task and the claimant reported that she typically experienced difficulty staying on task, ignoring distractions, and being productive. The claimant's affect was stable and appropriate. The claimant did not present with any significant or observable signs of anxiety. The claimant appeared to possess "average to low average" cognitive functioning. She appeared to possess fair insight and judgment. Dr. Whitlow diagnosed the claimant with attention deficit hyperactivity disorder and unspecified anxiety disorder (5F).

Regarding the four work-related mental abilities, Dr. Whitlow expressed the following medical opinion: (1) From a mental health perspective, the claimant does not appear to have limitations with understanding or remembering instructions. The claimant appears to have some level of limitations with carrying out instructions, but not disabling limitations on this domain. Specifically, the claimant's ADHD diagnosis causes her to experience difficulty getting started on tasks, giving adequate attention to tasks, and following through on tasks, which can have impacts on her ability to carry out instructions. However, although the claimant reported that she has a significant history of struggling with procrastination, she did not identify poor productivity or lack of adequate performance as an issue; (2) The claimant appears to have some level of limitations in the functional assessment area

4

of maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks, but not disabling limitations with these domains. Specifically, the claimant's ADHD diagnosis causes her to experience difficulty with ignoring distractions and thus, maintaining attention and concentration, to experience the tendency toward procrastination, which impacts her maintenance of persistence and pace during task, and to experience difficulty starting on and following through on tasks, which can have impacts on her ability to complete tasks. However, although the claimant reported that she has a significant history of struggling with procrastination, she did not identify poor productivity or lack of adequate performance as an issue; (3) From a mental health perspective, the claimant does not appear to have disabling limitations in the functional assessment area of responding appropriately to supervision and to coworkers in a work setting. However, it is important to note that the claimant experiences anxiety symptoms that cause her to engage in people pleasing behaviors that can create unhealthy dynamics between herself and coworkers and, from what she believes, has contributed to her having poor interpersonal relationships with her coworkers. The things that she described were not assessed to be debilitating or disabling; and (4) From a mental health perspective, the claimant does not appear to have limitations in the functional assessment area of responding appropriately to work pressures in a work setting (5F/11-12).

…

On September 22, 2017, Douglas Waltman, MD, of Charak, completed a form about the claimant's mental capabilities. Dr. Waltman expressed the following medical opinion: (1) the claimant is able to

5

remember, understand, and follow directions; (2) the claimant is able to maintain attention in conversation. The claimant reports difficulty completing tasks; (3) regarding sustained concentration, persisting at tasks, and completing them timely, the claimant is not meeting expectations based on her report "it's harder to do things especially the last two weeks because I have not gotten anything done"; and (4) regarding reacting to the pressures, in work setting or elsewhere, involved in simple and routine, or repetitive tasks, the "claimant reports experiencing increased anxiety when faced with tasks" but she reports that "medications seem to help her" as well as setting up a structured routine and schedule (7F/3-5).

...

On November 7, 2017, the claimant saw nurse practitioner Kelley Sega at Charak. The claimant had last been seen at Charak on August 29, 2017. The claimant told Ms. Sega that she had been mostly compliant with her medications although she completely ran out of all her medications last week. She said she had been having a hard time concentrating lately because she had been out of her Adderall for over a month now. The claimant explained that she was unable to come in earlier than now for medication refills due to her busy school and babysitting schedule. On examination, the claimant was well groomed; she was cooperative; her speech was normal; her thought processes were logical; her mood was euthymic; her cognition was not impaired; her insight was average; and her judgment was fair. Ms. Sega increased Latuda and continued the claimant's other medications (8F/66-70).

6

On December 29, 2017, the claimant saw Ms. Sega. The claimant reported being out of medication for almost a month because of her busy schedule with school and babysitting caused her to miss her appointment. The claimant stated that she failed two classes this semester—she was doing well but then ran out of her medications and lost motivation to go to class. On examination, the claimant was well groomed; she was cooperative; her speech was normal; her thought processes were logical; her mood was depressed and anxious; her cognition was not impaired; her insight was good; and her judgment was fair. Ms. Sega increased Zoloft, continued Adderall, and decreased the claimant's Latuda because the claimant told her that the increase in Latuda had made her drowsy during the day (8F/60-65).

On January 26, 2018, the claimant told Ms. Sega that she had been doing better since her last visit and she did "well" when taking her medications (8F/54).

On April 19, 2018, the claimant told Ms. Sega that she had been doing very well. She stated that her concentration was good at her new job. She said she was worried what would happen in a few months because it was only a contract job but stated that it was good for now though. On examination, the claimant was well groomed; she was cooperative; her speech was normal; her thought processes were logical; her mood was euthymic; her cognition was not impaired; her insight was fair; and her judgment was fair (8F/30-35).

On May 17, 2018, the claimant told Ms. Sega that she had been doing well. The claimant felt that her medications were working. She stated she was

7

accepted into Cleveland State University and she was switching her major to computer analyst. She said she was able to transfer 50 credits and she excited to be starting something new. The claimant felt she would enjoy this major more than her previous major of court reporting. She stated that her depression and anxiety were mild and she denied any panic attacks in the last month. However, she said she had not sleeping as well lately, reporting that she started a new diet in which she was drinking more fluids so she had been waking up four to five times per night to use the bathroom. Ms. Sega refilled the claimant's Latuda, Zoloft, and Adderall (8F/24-29).

On July 16, 2018, the claimant told Ms. Sega that she had been having some good and bad stress. The claimant reported she was not doing well in school— she got a D in one class and was currently struggling in her current class. However, she was offered a full-time job and she had already started it. She stated that it was temporary work, but she was still excited to be working full time in an area she enjoyed. She stated her depression was mild. She stated her anxiety was somewhat moderate though due to having forgotten to take her medications for a few days. She said the Latuda made her drowsy so she did not take it for a few days so she could be more alert at work, but then she had a panic attack. Ms. Sega decreased Latuda and continued the claimant's other medications (8F/12-17).

It appears that the claimant's last appointment with Ms. Sega of Charak was on August 13, 2018. At that appointment, the claimant stated that her depression and anxiety were mild. However, she reported that her binge eating was "out of control." On examination, the claimant was well groomed; she

8

was cooperative; her speech was normal; her thought processes were logical; her mood was euthymic; her cognition was not impaired; her insight was fair; and her judgment was fair (8F/6-11).

On September 26, 2018, the claimant was admitted to Windsor-Laurelwood for suicidal ideation and a plan to jump off a building. The claimant denied prior inpatient psychiatric treatment. The claimant stated that her boyfriend had called Windsor-Laurelwood because she was feeling suicidal. The claimant reported significant stressors of relationship problems with her father and concerns about her weight and binge eating. While at Windsor-Laurelwood, medication changes were made. The claimant's Sertraline (Zoloft) was discontinued as it appeared to be exacerbating her mood and causing increased irritability and suicidal ideation. However, the claimant's Latuda was continued for mood stabilization. On October 2, 2018, the claimant was discharged to home in an improved condition. Her discharge medications included Lithium, Latuda, and Remeron. The claimant was instructed to follow up at Signature Health on October 9, 2018, for outpatient mental health services (10F/30-39).

On October 9, 2018, the claimant attended an intake appointment at Signature Health. The claimant reported that she went "downhill" a few weeks ago. She explained that she missed some appointments at Charak, stopped her medications on her own, lost her job because of depression, stopped taking her Adderall, and had been and admitted to Windsor-Laurelwood. The intake social worker referred the claimant for individual counseling and medication management (16F/208-209).

9

On October 17, 2018, the claimant started to treat with nurse practitioner Kathleen Christy at Signature Health. Ms. Christy stopped the claimant's Latuda and prescribed Vyvanse, Remeron, Vraylar, and Vistaril (16F/210-215).

On December 13, 2018, the claimant saw Ms. Christy. The claimant reported that her depression was not good, and she recently had a breakup with her boyfriend, so she had had suicidal ideation. She said she had thought of going to the North Chagrin Park and jumping off a cliff. She was also isolating in her room at home. The claimant was agreeable to going to the hospital. The claimant had not taken any medications that day and she had just picked up her Abilify that had been prescribed last week by Ms. Christy (16F/228-233).

On December 13, 2018, the claimant was admitted to Windsor-Laurelwood for suicidal ideation and a plan to jump off a cliff. The claimant had been started on Lithium at her Windsor–Laurelwood admission in September 2018, and she felt that it was helping her. However, she developed an allergy to it and broke out with a severe rash, and the medication had to be discontinued. While at Windsor-Laurelwood, medication changes were made. On December 19, 2018, the claimant was discharged to home in an improved condition. Her discharge medications included Geodon, Clonidine, and Remeron. The claimant was instructed to follow up at Signature Health (10F/14-16).

On January 22, 2019, the claimant started to treat with nurse practitioner Hiu Kwan Yip at Signature Health. The claimant stated that Geodon had been "working wonderfully" though she had been off it for

10

the past three days because she was out of refills. She also said her anxiety and panic were in better control since taking the Geodon and Clonidine. On examination, the claimant was cooperative; her attention and concentration were fair; her mood was euthymic; her speech was normal; her thought process was linear; her memory was intact; her insight was fair; and her judgment was fair. Ms. Yip diagnosed unspecified bipolar disorder, attention deficit hyperactivity disorder, and unspecified anxiety disorder. Ms. Yip continued Geodon for mood stabilization and anxiety, continued Clonidine for panic, continued Mirtazepine (Remeron) for sleep and anxiety, and started Vyvanse for attention deficit hyperactivity disorder (16F/234-240).

On June 27, 2019, the claimant saw Ms. Yip. The claimant had been off Geodon for a week because she was not aware that she had refills. However, the claimant also felt 60 mg of Geodon had lost its effect. She described increased mood fluctuation, feeling negative "not depressed, but getting there," increased irritability, and being moody and angry for no reason. On examination, the claimant was cooperative; her attention and concentration were fair; her mood was depressed; her speech was normal; her thought process was linear; her memory was intact; her insight was fair; and her judgment was fair. Ms. Yip increased Geodon, continued Clonidine and Vyvanse, stopped Remeron and started Doxepin instead (16F/260-266).

On October 22, 2019, the claimant told Ms. Yip that her Amitriptyline caused increased forgetfulness so she self-adjusted it back to 10 mg and the side effects had subsided. The claimant said her mood had been "great" and her anxiety was in good control which she attributed to the Sertraline (Zoloft) and OTC

11

ashwagandha and magnesium. On examination, the claimant was cooperative; her attention and concentration were fair; her mood was anxious; her speech was normal; her thought process was linear; her memory was intact; her insight was fair; and her judgment was fair. Ms. Yip noted that the claimant had had improved medication adherence by using a pill box. Ms. Yip decreased Amitriptyline and she continued Vyvanse, Sertraline, Geodon, and Clonidine (16F/288-294).

On March 13, 2020, the claimant saw Ms. Yip. The claimant reported that she had stopped her Sertraline a month ago due to sexual side effects and had increased irritability since being off the Sertraline. The claimant said that her generalized anxiety was manageable with infrequent panic attacks and her Vyvanse continued to help attention problems. She said she had full time work and school, and she denied concerns with work or academic performance. On examination, the claimant's attention and concentration were fair; her mood was anxious; her speech was normal; her thought process was linear; her memory was intact; her insight was fair; and her judgment was fair. Ms. Yip stopped Sertraline and started Wellbutrin instead and she continued Vyvanse, Geodon, and Clonidine (16F/316-322).

On July 29, 2020, the claimant had a telehealth appointment with Ms. Yip. The claimant reported being off the Geodon for a week because she was out of refills. Since off Geodon, the claimant reported increased depressed mood, increased irritability, increased social withdrawal, but she denied suicidal ideation. She described situational panic at the dentist's office, but otherwise her anxiety was in control. The claimant said that Vyvanse continued

12

to help her attention deficit hyperactivity disorder symptoms. She said she had stopped taking the Wellbutrin because it was ineffective for mood. On examination, the claimant was cooperative; her attention and concentration were fair; her mood was depressed; her speech was normal; her thought process was linear; her memory was intact; her insight was fair; and her judgment was fair. Ms. Yip stopped Wellbutrin, increased Hydroxyzine, and continued Geodon, Vyvanse, and Clonidine (16F/337-343).

On November 10, 2020, the claimant had a telehealth appointment with Ms. Yip. The claimant reported that for the past week she had been depressed, amotivated, easily frustrated, easily agitated, had outbursts (throw things, yelling), feeling hopeless, crying, increased sleep of 13-16 hours a day, difficulty maintaining an 8-hour workday (only able to work 5-6 hours a day which caused finance problems). She denied suicidal ideation and anxiety, but said she was stressed about finances. The claimant wanted to try counseling again. On examination, the claimant was cooperative; her attention and concentration were fair; her mood was depressed; her speech was normal; her thought process was linear; her memory was intact; her insight was fair; and her judgment was fair. Ms. Yip made some medication changes, and she referred the claimant to counseling with Stephanie Frank because she had seen her in the past (16F/359-366).

On November 18, 2020, the claimant was admitted to Windsor-Laurelwood for worsening symptoms of depression and suicidal ideation. The claimant did not know the specific trigger over the past several weeks for her worsening depression. While at

13

Windsor -Laurelwood, medication changes were made including being placed on Lithium again despite her report she had hives after a 2-week trial of it in 2018. The psychiatrist at Windsor-Laurelwood discussed with the claimant that this reaction may not have been due to the medication itself, but perhaps an artifact of a filler in the formulation of the medication she had tried. The claimant noted that Lithium was the most helpful psychiatric medications she had previously tried and given that it was the most helpful, she agreed to try it again. On November 24, 2020, the claimant was discharged to home. Her discharge medication included Lithium CR. The claimant was instructed to follow up at Signature Health (10F/2-8).

On December 29, 2020, the claimant followed up with Ms. Yip. The claimant had been on Lithium for a month now without allergic reactions; the claimant noted that she was sensitive to the immediate release but tolerated the extended release well. However, she had been off the Lithium for a week now because she ran out of pills. She said she liked Lithium because she could handle stress better since starting Lithium. She described her mood as "still depressed, but not sad or suicidal." On examination, the claimant was cooperative; her attention and concentration were fair; her mood was depressed; her speech was pressured; her thought process was circumstantial; her memory was intact; her insight was fair; and her judgment was fair. Ms. Yip restarted the claimant's Lithium CR and continued Strattera, Hydroxyzine, and Clonidine (16F/367-374).

On January 13, 2021, Ms. Yip stopped the claimant's Lithium CR because the claimant said it only

14

worked "10%" and gave her various side effects. Ms. Yip started Lamotrigine instead (16F/375-382).

On January 27, 2021, the claimant told Ms. Yip that she had not started the Lamotrigine because she did not believe it would work for her mood. She had not been taking her Strattera. She reported a depressed mood and lack of motivation. On examination, the claimant was ambivalent; her attention and concentration were poor; her mood was depressed; her speech was normal; her thought process was linear; her memory was intact; her insight was fair; and her judgment was fair. Ms. Yip discontinued Lamotrigine due to the claimant's perceived lack of efficacy, increased Clonidine, and continued Strattera and Hydroxyzine (16F/383-390).

On February 12, 2021, the claimant had a telehealth appointment with Ms. Yip. She reported a depressed mood and lack of motivation. On examination, the claimant was frustrated; her attention and concentration were poor; her mood was depressed; her speech was normal; her thought process was linear; her memory was intact; her insight was fair; and her judgment was fair. Ms. Yip continued the claimant's Strattera, Clonidine, and Hydroxyzine (16F/391-398).

On March 31, 2021, the claimant had a telehealth appointment with Ms. Yip. On examination, the claimant was frustrated; her attention and concentration were poor; her mood was depressed; her speech was normal; her thought process was linear; her memory was intact; her insight was fair; and her judgment was fair. Ms. Yip discontinued Strattera because the claimant never started it and continued Clonidine and Hydroxyzine (16F/399-405).

15

On April 21, 2021, the claimant had a telehealth appointment with Ms. Yip. She reported a depressed mood and high anxiety. On examination, the claimant was frustrated; her attention and concentration were poor; her mood was depressed and anxious; her speech was normal; her thought process was linear; her memory was intact; her insight was fair; and her judgment was fair. Ms. Yip continued Clonidine and Hydroxyzine because the claimant preferred no new medications at that time (16F/406-412).

On May 4, 2021, the claimant told Ms. Yip that she had only been taking half of the prescribed dose of the Hydroxyzine and Clonidine because she felt that she did not need the higher doses at that time. On examination, the claimant was less frustrated; her attention and concentration were poor; her speech was normal; her thought process was linear; her memory was intact; her insight was fair; and her judgment was fair. Ms. Yip explored treatment options with the claimant, but the claimant said she did not want to try any new medications at this time because she had tried many medications in the past with poor response and tolerability. The claimant felt she had exhausted her medication options. Ms. Yip discussed getting a second opinion from her collaborating physician, but the claimant declined. As such, Ms. Yip continued Clonidine and Hydroxyzine (16F/413-419).

…

On October 27, 2021, the claimant had a telehealth appointment with Ms. Yip. The claimant reported that she stopped her Clonidine and Hydroxyzine in June 2021. The claimant was not taking any psychiatric medication, but she was participating in individual counseling with Ms. Frank of Signature

16

Health. She told Ms. Yip that her mood was irritable, and she complained of high anxiety. On examination, the claimant's speech was pressured; her reported mood was irritated, anxious, and depressed; her thought process was unremarkable; her attention was alert; her memory was grossly intact; her insight was poor; and her judgment was poor. The claimant declined medication and said she preferred individual counseling only for now (23F/32-34).

...

On February 3, 2022, the claimant had another individual counseling appointment by telephone with Stephanie Frank, LPCC, of Signature Health. The claimant shared how family dynamics had been impacting her and her self-beliefs. Ms. Frank reviewed the claimant's progress, assisted the claimant in processing thoughts and feelings, and explored future goals. She provided the claimant with an "unhealed childhood trauma" sheet. Ms. Frank thought the claimant would benefit from additional counseling to continue to processing thoughts and feelings. She transferred the claimant to Tiara Fulton, LPC (27F/32-33) and on February 10, 2022, the claimant started individual counseling with Ms. Fulton (27F/30-31).

In 2022 and 2023, the claimant continued to participate in individual counseling through Signature Health (32F; 33F).

On March 2, 2023, the claimant had a telehealth appointment with Amanda Shields, APN, of Signature Health. The claimant reported mood swings and feeling very anxious. On examination, the claimant's motor activity was calm; her speech was unremarkable; her reported mood was depressed and nervous; her thought process was

17

goal directed and linear; her attention was alert; she was cooperative; her memory was grossly intact; her insight was fair; and her judgment was fair. The claimant did not want any medication, but she wanted a GeneSight test. Ms. Shields advised the claimant to come in on Monday to see the nurse about a GeneSight test, and then to follow up with her in two months (33F/125-132). However, the claimant did not follow up with Ms. Shields until July 2023.

On July 11, 2023, the claimant followed up with Ms. Shields by video. The claimant had been offered a GeneSight test at her last appointment because she did not want to take medications/had medication concerns. She reported that she had too many side effects from medications in the past and she did not feel that medication was a safe option for her. The claimant had been offered a GeneSight test but the claimant said that she did not come to the office for testing due to trouble with her car. On examination, the claimant's motor activity was calm; her speech was unremarkable; her reported mood was depressed and nervous; her thought process was goal directed and linear; her attention was alert; she was cooperative; her memory was grossly intact; her insight was limited; and her judgment was impaired. The claimant declined medication. Ms. Shields offered GeneSight testing again, and she asked the claimant to follow up with her in three months (33F/72-76).

Although the claimant continued to participate in individual counseling through Signature Health, it does not appear that the claimant showed for GeneSight testing, and the claimant did not follow up with Ms. Shields after July 11, 2023 (37F).

Tr. 23–34.

18

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.  Since May 24, 2015, the alleged onset date, the claimant engaged in substantial gainful activity during the following period: February 2018 to September 2018 only (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: anxiety/generalized anxiety disorder, attention deficit disorder/attention deficit hyperactivity disorder, depression/major depressive disorder, and bipolar disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant cannot work at a production rate pace (meaning, not being able to do assembly line type of work).

6.  The claimant is capable of performing past relevant work as a data entry clerk and chauffeur

driver. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from May 24, 2015, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. 19–38.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is

20

> disabled. If not, the ALJ proceeds to the next
> step.
>
> 4.     What is the claimant's residual functional
>        capacity and can the claimant perform past
>        relevant work? If so, the claimant is not
>        disabled. If not, the ALJ proceeds to the next
>        step.
>
> 5.     Can the claimant do any other work
>        considering the claimant's residual functional
>        capacity, age, education, and work
>        experience? If so, the claimant is not disabled.
>        If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains

21

'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. at 103 (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Focusing on the ALJ's consideration of four medical opinions, Frost claims that the ALJ cherry-picked evidence in arriving at Frost's RFC. *See e.g.*, Doc. 9, at 11–17.

22

As an initial matter, cherry-picking-evidence arguments are "seldom successful." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) ("The District Court observed that this allegation is seldom successful because crediting it would require a court to re-weigh the evidence. It is no more availing on appeal."). This is the case because, although an ALJ errs by only citing facts to support a finding of non-disability while ignoring evidence that points to a disability finding, *see Gentry v. Comm'r*, 741 F.3d 708, 723–24 (6th Cir. 2014), an ALJ's decision to only mention certain evidence doesn't mean that the ALJ was cherry-picking evidence. Afterall, ALJs aren't "require[d] … to discuss every piece of evidence in the record." *Showalter v. Kijakazi*, No. 22-5718, 2023 WL 2523304, at *3 (6th Cir. Mar. 15, 2023); *see Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Indeed, "with a[n] [over two]-thousand-page record, the ALJ cannot be expected to discuss every piece of evidence that [Frost] believes is inconsistent with the" ALJ's findings. *See Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022), report and recommendation adopted, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022).

Further, the Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. §

23

416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted). Although an ALJ must discuss the supportability and consistency factors, 20 C.F.R. § 416.920c(a), the ALJ need not use the magic words *supportability* and *consistency*. *See Cormany*, 2022 WL 4115232, at *3 (collecting cases).

Frost begins by admitting that "[t]he ALJ performed this evaluation [of consistency and supportability] and found the opinion evidence to be only partially/not fully persuasive. However, the error occurred when the ALJ

parsed the opinions even within the individual doctor's report, and rejected verifiable limitations identified by the medical professionals." Doc. 9, at 12 (citations omitted). This admission is an obvious problem for Frost because she concedes that the ALJ complied with the regulations requiring ALJs to consider supportability and consistency. *See* 20 C.F.R. § 416.920c(b)(2) (requiring the ALJ to discuss the supportability and consistency factors when discussing a medical opinion). Additionally, Frost's introduction to her argument illustrates that she simply takes issue with the ALJ's "parse[ing]"[3] of the opinions and "reject[ion]" of certain limitations. Doc. 9, at 12. Stated differently, Frost's argument amounts to her disagreement with the ALJ's conclusions rejecting certain limitations contained within the medical opinions. But this argument on its own, i.e. a challenge to the ALJ's weighing of and conclusions regarding the evidence, does not support remand because the ALJ is solely responsible for weighing the evidence, be that medical records

---

[3]      Frost's use of the term "parse," and the variations of that term, is a red herring of sorts. Although Frost imparts a negative connotation to the term, she uses it to signify her disagreement with the ALJ's consideration and weighing of the evidence. For the reasons explained, however, she does not show that the ALJ failed to consider the record, and it is not this Court's role to reweigh evidence.

Indeed, the verb "to parse" is defined as "to examine in a minute way : analyze critically." Merriam-Webster Dictionary, *Parse*, https://www.merriam-webster.com/dictionary/parse, **[https://perma.cc/G2DS-26AH]**. Under this plain-language definition of the word, the ALJ is required to *parse* the entire record. *See* 20 C.F.R. § 404.1520c(a) (explaining how the ALJ will consider and weigh medical opinions and prior administrative medical findings). So it is somewhat unclear why Frost repeatedly uses this term to claim error by the ALJ.

25

or medical opinions. *See* 20 C.F.R. § 404.1520c(a) (explaining how the ALJ will consider and weigh medical opinions and prior administrative medical findings); *see also Rottman v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 196 (6th Cir. 2020 ("[T]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job.") (citation omitted)).

In addition to Frost's admission that the ALJ performed the requisite evaluation of the evidence, Doc. 9, at 12, the following discussion illustrates that none of Frost's arguments related to the substance of the ALJ's evaluation provide a basis for remand.

*Dr. Whitlow's Opinion*

The ALJ evaluated Dr. Whitlow's opinion:

> Dr. Whitlow's medical opinion is somewhat persuasive. Part (1) of Dr. Whitlow's opinion regarding no limitations with understanding or remembering instructions is persuasive because it is supported by her mental status examination of the claimant. Part (1) of Dr. Whitlow's opinion regarding the claimant appears to have "some level of limitations" with carrying out instructions is less persuasive because the term "some level of limitations" is vague, and she did not support it with an adequate explanation. In addition, that part of the opinion is not fully consistent with the claimant's report that her medications including Adderall for ADHD help or Dr. Whitlow' s observation that the claimant presented with only "mild signs of ADHD" (5F/7). Part (2) of Dr. Whitlow's opinion is not persuasive because the term "some level of limitations" is vague which renders it less useful. Furthermore, she did not support it with an adequate explanation and it is not

26

> consistent with her observation that the claimant presented with only "mild signs of ADHD" (5F/7). Part (3) of Dr. Whitlow's opinion is not persuasive because it is vague which renders it less useful. While Part (4) of Dr. Whitlow's opinion is not vague, it is not fully persuasive because the claimant testified that she has experienced being stressed out when employers started "adding more to her plate."

Tr. 26.

As to Dr. Whitlow's opinion, Frost doesn't argue that the ALJ failed to consider the supportability or consistency of Dr. Whitlow's opinion. Instead of focusing on whether the ALJ complied with the applicable regulations, Frost argues that "[d]espite" the fact that Dr. Whitlow is a "Social Security consulting physician, the ALJ parsed Dr. Whitlow's opinions." Doc. 9, 12. But Frost cites no authority—and the Court is aware of none—that says the opinion of a consulting physician must be accepted at face value. Nor does Frost cite authority to support her implicit assertion that an ALJ should not "parse" a consulting physician's opinion.

Frost next says that the "ALJ erred in executing her duty to explain the parsing of Dr. Whitlow's opinions." Doc. 9, at 12–13. Ultimately, however, Frost makes very little argument to show how this alleged "parsing" amounted to reversible error. *Id.* Rather, she simply summarizes the ALJ's analysis of Dr. Whitlow's opinion and makes the unsupported and conclusory assertion that "[t]hese findings impact the ability of Plaintiff to be employed, and required far

27

greater explanation and the required logical bridge analysis."[4] *Id.* at 13. Because Frost does not support this argument with anything beyond her own opinion, her position amounts to a conclusory argument that the ALJ's findings "required far greater explanation." As presented, Frost has forfeited this undeveloped claim. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

Frost next takes issue with the ALJ's description of portions of Dr. Whitlow's opinion as "vague" and that certain portions were more or less persuasive than others. Doc. 9, at 13. To this end, she asserts that the ALJ erred when she "undertook no genuine analysis to clarify Dr. Whitlow's

---

[4]    Like many Social Security plaintiffs, Frost refers to "the logical bridge analysis," as if there is a special obligation for a Social Security ALJ to "build a logical bridge" between her analysis and conclusion. Doc. 9, at 1, 10, 11, 16–17. This reference to a *logical bridge* apparently first appeared in this Circuit in *Allshouse v. Commissioner of Social  Security*, No. 07-12516, 2008 WL 4372646, at *9 (E.D. Mich. Sept. 19, 2008), which relied on Seventh Circuit precedent. But the idea that an adjudicator's logic should be discernible is not a special feature of Social Security cases. Indeed the line of Seventh Circuit precedent from which the phrase emerged began outside the Social Security context as metaphor to make the generally applicable point that a court "cannot defer to something that is not based on facts-logical facts—in the record." *J.C. Penney Co. v. NLRB*, 123 F.3d 988, 996 (7th Cir. 1997) ("we can only defer to the ALJ's findings when the reasons for his decision build an accurate and logical bridge between the evidence and the result. Here, the bridge is out."). So the idea behind the metaphor is not a doctrine. Rather it is a truism.

perceived vagueness and, in rejection this medical opinion based on subjective reports by the patient, she exhibited a 'fundamental misunderstanding' of the nature of Dr. Whitlow's role as a mental health professional." *Id*. But it is within the ALJ's province to find an opinion less persuasive if it is vague. *Woodard v. Comm'r of Soc. Sec. Admin.*, No. 5:22-cv-1728, 2023 WL 6005004, at \*10 (N.D. Ohio July 27, 2023) ("Opinions that express functional limitations in vague terms can be discounted as not describing any functional limitations at all.") (citing *Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018)), *report and recommendation adopted*, 2023 WL 5842016 (N.D. Ohio Sept. 11, 2023); *see also* 20 C.F.R. § 416.945(a)(1) (defining a claimant's RFC as "the most you can still do despite your limitations."). And Frost does not point to any requirement that the ALJ must "clarify [a] perceived vagueness." So Frost's conclusory argument in this regard is also forfeited. *See McPherson*, 125 F.3d at 995.

At bottom, Frost takes issue with the ALJ's analysis related to Dr. Whitlow's consideration of her subjective statements. *See* Doc. 9, at 13. Notably, the ALJ did not discredit Dr. Whitlow's opinion solely because it was based on subjective evidence. The ALJ also explained that Dr. Whitlow's opinion was inconsistent with some of Frost's subjective complaints and testimony and was additionally inadequately supported and vague. *See* Tr. 26. Frost cites nothing to show that this analysis was error. *See* Doc. 9, at 13 (citing

*McFarland v. Comm'r of Soc. Sec. Administration*, No. 1:21-cv-1225, 2022 WL 3947134, at *14 (N.D. Ohio Aug. 2, 2022)).

In *McFarland*, the only case Frost cites to support her position, the Court explained that an ALJ's rejection of a medical opinion as "primarily based on subjective reports" represented a "fundamental misunderstanding" of that provider's role as a mental health professional. 2022 WL 3947134, at *14. But unlike in *McFarland*, ALJ Ma did not reject Dr. Whitlow's opinion simply because it was *based on subjective reports*. Instead, the ALJ explained that Dr. Whitlow's explanations were vague and that they were inconsistent with Frost's subjective reports. Tr. 26 (stating that, among other reasons, Dr. Whitlow's opinion were "not consistent with her observation that [Frost] presented with on 'mild signs of ADHD.'"). So the ALJ did not look at Dr. Whitlow's reliance on subjective reports as inadequate to support an opinion, as the ALJ in *McFarland* had.

Based on the distinctions between the ALJ's analysis here and the error in *McFarland*, it is apparent that Frost simply disagrees with the ALJ's finding that Dr. Whitlow's opinion was not entirely persuasive. This argument, however, amounts to a disagreement with the ALJ's weighing of the medical evidence, which does not support remand. *See* 20 C.F.R. § 404.1520c(a).

30

*Dr. Waltman's Opinion*

Next up is Dr. Waltman's opinion, which the ALJ evaluated as follows:

> Dr. Waltman's medical opinion is somewhat persuasive. Dr. Waltman's opinion at Parts (1) and (2) that the claimant can remember, understand, follow directions, and maintain attention in conversation is persuasive because it is supported by his mental status examination of the claimant that was "within normal limits." In particular, the claimant's concentration, memory, abstract reasoning, fund of information, intelligence, insight, and judgment were within normal limits (7F/3). In addition, that part of Dr. Waltman's medical opinion is persuasive because it is consistent with the limited course of mental health treatment. However, Parts (3) and (4) of his opinion are not persuasive because he simply quoted the claimant instead of offering his own medical opinion.

Tr. 26–27.

As to Dr. Waltman's opinion, Frost offers a one-paragraph critique in which she does not claim that the ALJ failed to discuss supportability or consistency. Instead, she argues that the ALJ erred by discounting Dr. Waltman's opinion "based on the fact that Dr. Waltman quoted" Frost. Doc. 9, at 13. According to Frost, the ALJ's explanation failed to "provide an acceptable basis for rejecting opinions of more limiting abilities, as determined by Dr. Waltman." *Id.*

For starters, Frost oversimplifies the ALJ's explanation by stating only that "[t]he ALJ's rejection was based on the fact that Dr. Waltman quoted the claimant[.]" Doc. 9, at 13. In actuality, the ALJ explained that parts three and

31

four of Dr. Waltman's opinion were "not persuasive because he simply quoted the claimant *instead of offering his own medical opinion.*" Tr. 27. Frost again only cites *McFarland*, but that case merely supports the general proposition that a mental health professional's opinion will necessarily be based on a claimant's subjective complaints. *See* Doc. 9, at 13 (citing *McFarland*, 2022 WL 3947134, at *14). As explained earlier, the court in *McFarland* found that an ALJ erred by rejecting a medical opinion because the opinion was "primarily based on subjective reports." This rejection, the court said, represented a "fundamental misunderstanding" of that provider's role as a mental health professional since the provider's opinion would necessarily be based on the claimant's subjective reports. 2022 WL 3947134, at *14. But, as with Dr. Whitlow's opinion, ALJ Ma did not reject Dr. Waltman's opinion simply because it was *based on subjective reports.*

Instead, the ALJ rejected portions of Dr. Waltman's statement because they did not constitute a medical opinion in the first instance. *See* Tr. 27. For example, Dr. Waltman's statement included, as to Frost's ability to sustain concentration, persist at tasks, and complete them in a timely fashion: "Not as motivated. Client is not meeting expectations. Reports, 'It's harder to do things especially the last two weeks because I haven't gotten anything done.'" Tr. 626. And, as to Frost's ability to "react to the pressures, in work settings or elsewhere, involved in the simply and routine, or repetitive, tasks," Dr. Waltman simply included that: "Client reports experiencing increased anxiety

32

when faced with tasks. She reports medications seem to help here, as well as setting up a structured routine and schedule." *Id.* As these excerpts show, and as the ALJ explained, Dr. Waltman simply included quotations or summaries of what Frost claimed without providing an opinion regarding how those symptoms would affect Frost's functioning. *See* Tr. 26. So, while it well may be true that a psychiatrist's opinion will typically be based in part on subjective complaints, ALJ Ma did not discount Dr. Waltman's opinion simply because that opinion was based on subjective complaints. She discounted portions of Dr. Waltman's opinion because it did not "offer[] his own medical opinion." Tr. 26–27. Frost does not point to any in case that would support the idea that the ALJ's partial rejection of Dr. Waltman's opinion on the basis that it did not amount to a medical opinion was error. So there is no basis to remand based on the ALJ's evaluation of Dr. Waltman's opinion.

*Dr. Warren's Opinion*

As to Dr. Warren's opinion, the ALJ said:

> Dr. Warren's medical findings are somewhat persuasive. The Appeals Council directed me to give further consideration as to the claimant's "maximum" residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (8A). In doing so, Dr. Warren's medical finding of completing 1-4 step tasks is not persuasive because Dr. Warren did not provide an adequate explanation in support of it. Furthermore, it is not consistent with the claimant having "average to low average" intelligence (5F/9) or that providers consistently noted that the claimant's memory was normal or intact (see above). Dr. Warren's medical

33

finding of in an environment without frequent distractions is not persuasive because it is not supported by the overall mental status examination findings regarding attention and concentration. As recounted above, on examinations of the claimant by her nurse practitioners at Charak, the claimant's mood was sometimes anxious, irritable, and/or depressed, but regarding cognition, her attention and concentration were only impaired on one occasion (see above). On examinations of the claimant by Ms. Yip, the claimant's mood was depressed, anxious, frustrated, and/or irritable at times. However, the claimant's attention and concentration were usually "fair" although her attention and concentration were "poor" five times (see above). Thereafter, the claimant was seen by Ms. Shields of Signature Health. In March 2023 and July 2023, Ms. Shields documented that the claimant's attention was "alert" (see above). Notably, the claimant did not testify about being distracted. Dr. Warren's medical finding of no fast pace or high production quotas is persuasive because it is consistent with the claimant's testimony that she when she starts a job, she does "good" and over-achieves, resulting in employers "adding more to her plate," and she tries to keep up with the added work but she "cannot keep up." As such, I find the claimant cannot work at a production rate pace. This limitation also adequately accounts for her attention deficit hyperactivity disorder symptoms. Although the claimant testified about social anxiety and difficulties talking with others, I decline to include any social interaction limitations based on the evidence outlined at Finding #4 regarding interacting with others. As mentioned, although the claimant has issues with her father, there is no evidence of significant problems getting along with other family members, friends, neighbors, or others. During the relevant timeframe, the  has attended classes at Tri-C and Cleveland State University at times (see above). In addition, the claimant testified that she has worked for Door Dash for the past year delivering items to customers.

34

Tr. 35–36.

Frost argues that "[i]n accepting and rejecting potions of [Dr. Warren's] report, the ALJ parsed an extensive record by relying only on portions which support the rejection of Dr. Warrant's limitations." Doc. 9, at 14. Frost's argument again accuses the ALJ of "pars[ing]" as if that is a prohibited practice. To the contrary, the ALJ is required to *parse*, meaning to analyze critically, the entire record. *See* 20 C.F.R. § 404.1520c(a). As noted, however, the ALJ is not obligated to cite every piece of evidence. *See Thacker*, 99 F. App'x at, 665; *Byler*, 2022 WL 980099, at *9 ("Although Plaintiff understandably disagrees with the ALJ's decision, the law does not require the ALJ to discuss every piece of evidence that is supportive or inconsistent with the RFC. And … the ALJ cannot be expected to discuss every piece of evidence that Plaintiff believes is inconsistent with the RFC."). So the ALJ's mere failure to cite the entire, over-2,000-page record does not illustrate that the ALJ's review was impermissibly *selective*, as Frost asserts. *See* Doc. 9, at 14.

Further, Frost presents nothing to overcome the ALJ's assertion that she considered the entire record. *See e.g.*, Tr. 23. The Court thus presumes that assertion is true. *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021); *see also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *cf. Higgs v. Bowen*, 880 F.2d 860,

864 (6th Cir. 1988) (noting that the Appeals Council "state[d] that it 'considered the entire record which was before the administrative law judge, including the testimony at the hearing'").

Additionally, to the extent that Frost argues that the evidence cited by the ALJ could have supported greater limitations, that argument does not mean that the limitations the ALJ included were unsupported by substantial evidence. *See Jones*, 336 F.3d at 475 ("we must defer to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'"). The ALJ spent approximately 20 pages discussing the medical evidence and, in particular, explained what evidence did or did not support Dr. Warren's opinion and gave specific examples of the inconsistencies between Dr. Warren's opinion and the record at large. *See* Tr. 35 (contrasting Dr. Warren's opined limitations with inconsistent evidence in the record and explaining the evidence supporting the ALJ's adopted limitations). And Frost does not raise any argument, let alone show, that the ALJ's decision to adopt fewer limitations than Dr. Warren opined lacked support from substantial evidence, as she must to demonstrate remand, so the fact that she believes there is evidence to support a different outcome is immaterial. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

36

*Nurse Yip's Opinion*

Frost finally focuses on Nurse Yip's opinion. The ALJ discussed Nurse

Yip's opinion:

> Ms. Yip's medical opinion of "marked" limitations is not persuasive because it is not fully supported by her mental status examinations of the claimant. On examinations of the claimant by Ms. Yip since January 22, 2019 (that is, the date the claimant started treating with Ms. Yip), the claimant's mood has been depressed, anxious, and/or frustrated at times. However, the claimant's attention and concentration were usually "fair" although they were "poor" five times; her thought process was consistently linear though it was circumstantial on one occasion; her memory was consistently intact; her insight was consistently fair; and her judgment was consistently fair (see above and 16F/243-244, 249-250, 256-257, 269-270, 276-277, 283-284, 297-298, 304-305, 311-312, 325-326, 332-333, 346-347, 353-354). Ms. Yip's medical opinion of "marked" limitations is not persuasive because it is not consistent with the course of mental health treatment. Since November 2020, the claimant has not been admitted again to Windsor -Laurelwood or any other psychiatric facility. While the claimant has treated with Ms. Yip on a regular basis, she has not required or received frequent or intensive outpatient mental health services. Notably, on May 4, 2021, Ms. Yip talked with the claimant about getting a second opinion from her collaborating physician at Signature Health, but the claimant declined. As such, Ms. Yip simply continued the claimant's Clonidine and Hydroxyzine (see above).
>
> …

37

Ms. Yip's medical opinion of "marked" limitations is not persuasive because it is not fully supported by her mental status examinations of the claimant. On examinations of the claimant by Ms. Yip since January 22, 2019 (that is, the date the claimant started treating with Ms. Yip), the claimant's mood has been depressed, anxious, frustrated, and/or irritable at times. However, the claimant's attention and concentration were usually " fair" although they were "poor" five times; her thought process was consistently linear or unremarkable though it was circumstantial on one occasion; her memory was consistently intact; her insight was consistently fair except for one occasion when it was poor; and her judgment was consistently fair except for one occasion when it was poor (see above and 16F/243-244, 249-250, 256-257, 269-270, 276-277, 283-284, 297-298, 304-305, 311-312, 325-326, 332-333, 346-347, 353-354). Ms. Yip's medical opinion of "marked" limitations is not persuasive because it is not consistent with the course of mental health treatment. Since November 2020, the claimant has not been admitted again to Windsor - Laurelwood or any other psychiatric facility. While the claimant has treated with Ms. Yip on a regular basis, she has not required or received frequent or intensive outpatient mental health services. Notably, on May 4, 2021, Ms. Yip talked with the claimant about getting a second opinion from her collaborating physician at Signature Health, but the claimant declined. As such, Ms. Yip simply continued the claimant's Clonidine and Hydroxyzine (see above).

Tr. 32–33.

Frost asserts two arguments in support of her claim that "the ALJ mischaracterized the evidence" as to Nurse Yip. Doc. 9, at 15. First, she says that the ALJ's finding that Frost did "not require[] or receive[] frequent or intensive outpatient mental health services is simply wrong; Ms. Frost had Signature Health appointments every one to two weeks." *Id.* She also claims

38

that "the ALJ largely ignores that Plaintiff had multiple inpatient treatment." *Id.* These assertions fail to provide a basis for remand because they are belied by the ALJ's decision. The ALJ's complete statement to which Frosts argument refers was that: "While the claimant has repeated with Ms. Yip on a *regular* basis, she has not required or received *frequent or intensive* outpatient mental health services." Tr. 32 (emphasis added); *see also* Tr. 33 (stating the same). Although Frost may disagree with the ALJ's characterization of Frost's outpatient treatment as *regular* rather than *frequent or intensive,* she points to nothing to show that this characterization was erroneous or that the ALJ's complete explanation was inaccurate. Likewise, the ALJ did not *ignore* Frost's inpatient treatment. In her discussion of the medical evidence, the ALJ detailed each instance of Frost's inpatient treatment. *See e.g.,* Tr. 28–30 (summarizing instances of Frost's inpatient treatment). And, in the ALJ's discussion of Ms. Yip's opinion, the ALJ further reiterated that "[s]ince November 2020, the claimant has not been admitted again to Windsor - Laurelwood or any other psychiatric facility." Tr. 32, 33.

Second, Frost claims that, when the ALJ found that the limitations about which Nurse Yip opined were inconsistent, the ALJ "ignore[d] or misstate[d] the treatment notes." Doc. 9, at 15. To this end, Frost simply provides a string cite to nearly 20 isolated pages of the record which, in Frost's view, presumably support the limitations that Nurse Yip recommended. *Id.* The citation to these records, with or without explanation, do not provide

39

support for remand. The fact that Frost can point to evidence in the record that, in her view, might support Nurse Yip's opinion  or otherwise support Frost's desired outcome is immaterial unless she can show that the ALJ's decision was unsupported by substantial evidence, which she has not done. *See Warner*, 375 F.3d at 390. Frost also fails to show that the ALJ ignored evidence. As explained throughout, the ALJ was not required to cite each piece of evidence and failure to do so does not support remand. *See Thacker*, 99 F. App'x at 665.

*2. The ALJ did not cherry-pick and the ALJ's decision is supported by substantial evidence.*

Throughout her brief, Frost asserts that the ALJ "cherry-picked" the evidence to reach her decision. *See* Doc. 9, at 12 (asserting that "the ALJ cherry picked the medical opinions of record."). The Court has explained the general flow in cherry-picking arguments.

None of Frosts arguments demonstrate that that the ALJ selectively reviewed the record or otherwise failed to consider all of the evidence. Indeed, ALJ Ma stated that she considered the entire record, Tr. 23, and absent a showing to the contrary that statement is presumed true, *see Newark Elec. Corp.*, 14 F.4th at 163. The cherry-picking arguments sprinkled throughout Frost's briefing illustrate that she is ultimately challenging the ALJ's weighing of the evidence. *See e.g.,*  Doc. 9, at 11, 12, 15, 16. The fact that Frost claims certain evidence was not explicitly cited in the discussion of the medical opinions, or that she views certain evidence should have been more heavily

40

weighed, does not show that the ALJ failed to consider it because the "ALJ need not discuss every piece of evidence in the record[.]" *See Thacker*, 99 F. App'x at 665; *see also Kornecky*, 167 F. App'x at 508.

The ALJ also did not "cherry pick[] limitations." Doc. 9, at 16. To the contrary, as the lengthy excerpted portions of the ALJ's summary of the medical evidence and medical opinion analysis above illustrates, the ALJ engaged in a detailed evaluation and explanation of the entire record before reaching an RFC assessment supported by substantial evidence. *See* Tr. 23-36 (spending approximately 13 pages summarizing and analyzing the evidence). Nothing that Frost cites in support of her argument shows that *the ALJ's decision* is unsupported by from substantial evidence. Instead Frost's argument simply shows that the record may support a different outcome if the evidence were weighed differently. But it is entirely permissible, if not probable, that the evidence can support two different outcomes. *See Jones*, 336 F.3d at 475. And it is not this Court's, nor Frost's, role reweigh the record, that duty is reserved to the ALJ. *See* 20 C.F.R. § 404.1520c(a).

As a final point, at the end of her argument section Frost presents three paragraphs which appear to offer a summary of her earlier arguments. Doc. 9, at 16–17. But none of those arguments provide a basis for remand. Frost begins this portion of her briefing without any appropriate argument heading, and it is unclear whether these arguments are contemplated by her sole heading. *See* Doc. 5, at 3 (requiring each argument section heading to correspond with the

41

argument presented under that heading). Nevertheless, her arguments fail on the merits for all of the reasons discussed above. Frost's general assertion that "[c]ase law is supportive o[f] remand under these circumstances[,]" provides no indication as to what *these circumstances* are. Doc. 9, at 16. Moreover, despite Frost's references to the regulations pertaining to an ALJ's consideration of medical opinion evidence, Frost did not develop any argument that the ALJ failed to comply with those regulations. Indeed, she concedes that the ALJ discussed the supportability and consistency of the relevant medical opinions. So this argument is waived. *McPherson*, 125 F.3d at 995.

### Conclusion

For all of the reasons explained, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated: March 4, 2026                             */s/ James E. Grimes Jr.*
                                                 James E. Grimes Jr.
                                                 U.S. Magistrate Judge

42